United States Court of Appeals
Fifth Circuit

**F I L E D**

**November 17, 2005**

Charles R. Fulbruge III
Clerk

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

No. 05-60060
Summary Calendar
_____

CHARLES MOORE, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY
SITUATED, GEORGE E. "JACK" BROWN, INDIVIDUALLY AND ON BEHALF OF ALL
OTHERS SIMILARLY SITUATED,

Plaintiffs - Appellants,

versus

ITAWAMBA COUNTY, MISSISSIPPI, THE ITAWAMBA COUNTY, MISSISSIPPI
SUPERINTENDENT OF EDUCATION, ITAWAMBA COUNTY MISSISSIPPI SCHOOL
BOARD,

Defendants - Appellees.

-----------------------------
Appeal from the United States District Court
for the Northern District of Mississippi, Eastern Division
USDC No. 1:03-CV-162-D-D
-----------------------------

Before HIGGINBOTHAM, BENAVIDES, and DENNIS, Circuit Judges.

PER CURIAM:

Responding to the 2000 census which found a maximum population
deviation of 20.09%, Itawamba County sought to reapportion its five
supervisor and school board voting districts. The new plan redrew
the boundaries of five districts: two districts on the Western side
of the Tennessee-Tombigbee Waterway and three smaller districts on
the Eastern side of the Waterway.

I

The Itawamba County Board of Supervisors approved the plan in July, 2002, by a 4-1 margin, and the Department of Justice pre-cleared it in February, 2003. Moore, plaintiff-appellant, then filed the present action in April, 2003, alleging a violation of the one-person, one-vote principle attributed to the equal protection clause of the Fourteenth Amendment.[1] After a bench trial in December, 2004, the district court rendered judgment in favor of Itawamba County, concluding that Moore had not met his burden of proof on the claim of vote dilution.

Moore urges that the undisputed 9.38% population deviation among the new voting districts denies equal protection and that the district court misapplied applicable law in faulting his effort to rebut the presumption that a deviation of less than ten percent will not support a finding of constitutionally impermissible discrimination.[2]

We ask afresh whether the district court correctly applied the standard enunciated in *Brown v. Thompson*,[3] reviewing the findings of fact under the clearly erroneous standard.[4]

---

[1] As adduced on cross examination, the plaintiffs in this case, though arguing on behalf of both Western districts, are only from one of the five districts. There is no claim of discrimination based on race or any other suspect classification, requiring heightened scrutiny. *See Cox v. Larios*, 124 S.Ct. 2806, 2809 (2004) (SCALIA, J., dissenting).

[2] *See Brown v. Thompson*, 462 U.S. 835, 842 (1938).

[3] *Id.*

[4] FED.R.CIV.P. 52(a); *Bituminous Cas. Corp. v. Vacuum Tanks, Inc.*, 75 F.3d 1048, 1051 (5th Cir. 1996).

The district court concluded "that the Plaintiffs have failed to meet their burden of proof and cannot prove that the present voting districts in Itawamba are discriminatory."  The district court appears to focus on the percentage of population deviation as the determinative obstacle to Moore's discrimination claim: "Thus, if the maximum population deviation between districts is less than 10%, no discrimination has taken place and any deviations are considered minor," and "[a]s noted above, when the maximum deviation is less than 10%, *Brown* holds that no one-person/one-vote violation has occurred."  Moore quarrels with the application of this standard.  The County replies that it was properly applied and that Moore mischaracterizes the district court's opinion.

The formulaic threshold is not an absolute determinant. Rather, it effectively allocates the burden of proof.  Population deviation less than ten percent, for example, is not *per se* nondiscriminatory and is not an absolute bar to a claim of vote dilution.[5]  At the same time, a deviation in population equality

---

[5] *See Chen v. City of Houston*, 205 F.3d 502, 523 n.15 (5th Cir. 2000) (stating "[a]nd even if the ten percent *de minimis* threshold is not viewed as an absolute bar....") (citing *Daly v. Hunt*, 93 F.3d 1212, 1220 (4th Cir. 1996) (stating "if the maximum deviation is less than 10%, the population disparity is considered *de minimis* and the plaintiff cannot rely on it alone to prove invidious discrimination or arbitrariness.  ...the plaintiff would have to produce further evidence to show that the apportionment process had a 'taint of arbitrariness or discrimination')); *see also Roman v. Sincock*, 377 U.S. 695 (1964) ("In our view the problem does not lend itself to any such uniform formula, and it is neither practicable nor desirable to establish rigid mathematical standards for evaluating the constitutional validity of a state legislative apportionment scheme under the Equal Protection Clause. Rather, the proper judicial approach is to ascertain whether, under the particular circumstances existing in the individual State whose legislative apportionment is at issue, there has been a faithful adherence to a plan of population-based

greater than ten percent establishes a *prima facie* case of discrimination and shifts the evidentiary burden to the state, requiring justification for the deviation.[6] With a deviation less than ten percent, a plaintiff must prove that the redistricting process was tainted by arbitrariness or discrimination.[7] That is, a deviation less than ten percent is not a safe harbor, barring any claim of discrimination, as the district court's order suggests.[8] *Brown*, itself, prefaces the applicable standard with the phrase, "as a general matter."[9] That is, minor deviations do not amount to a *prima facie* case of discrimination under the Fourteenth Amendment, but they do not foreclose the possibility of success altogether; there may be other evidence.

III

Moore argues that there was such evidence of bad faith, arbitrariness, and discrimination in the apportionment of the five

---

representation, with such minor deviations only as may occur in recognizing certain factors that are free from any taint of arbitrariness or discrimination."), *cited in*, *Brown*, 462 U.S. at 843.

[6] *Brown*, 462 U.S. at 842-43.

[7] See *supra* n.7.

[8] *See Cox*, 124 S.Ct. 2806 (summarily affirming a finding of discriminatory vote dilution in contravention of the equal protection clause of the Fourteenth Amendment, where the maximum population deviation among the districts remained below ten percent). "[A]ppellant invites us to weaken the one-person, one-vote standard by creating a safe harbor for population deviations of less than ten percent, within which districting decisions could be made for any reason whatsoever. The Court properly rejects that invitation." *Id*. at 2808 (STEVENS, J., concurring).

[9] "Our decisions have established, *as a general matter*, that an apportionment plan with a maximum population deviation under 10% falls within the category of minor deviations." *Brown*, 462 U.S. at 842 (emphasis added).

districts–the rigid adherence to geographic borders and the disproportionate allotment of education resources in the County. The district court, in its opinion, did not pause to address the legal possibility of rebutting a presumption of nondiscrimination arising from the sub-standard deviation in district population and did not elaborate on the related facts. Perhaps it was because the proof did not amount to much. Ultimately, it is of no matter because, "we cannot say on this sparse record that a reasonable fact finder could find that the [County's] decisions here evidenced the bad faith, arbitrariness, or invidious discrimination courts have required in cases involving variations under ten percent."[10]

Moore contends that the redistricting committee knew or should have known that strictly maintaining natural geographic boundaries, here the Waterway dividing the county, would disadvantage the two districts on its Western side. This knowledge, Moore argues, evidences discrimination, arbitrariness, and a lack of good faith in developing the redistricting plan, sufficient to fall within the type of prohibited conduct barred by the Fourteenth Amendment's equal protection clause.

Moore's assertion lacks merit. It is true that conforming to geographic boundaries will no longer justify a more than *de minimis* population deviation;[11] it is equally true that abiding by a list

---

[10] *Chen*, 205 F.3d at 523 n.15 (internal quotations omitted).

[11] "Modern developments and improvements in transportation and communications make rather hollow...most claims that deviations from population-based representation can validly be based solely on geographical considerations." *Reynolds v. Sims*, 377 U.S. 533, 580 (1964).

of desired criteria that includes adherence to such an instruction does not support a finding of bad faith or, otherwise, invalidate a redistricting plan.[12] The redistricting committee followed a ten point list of criteria in developing its plan. Moore alleges that the committee impermissibly sacrificed some of the other criteria in order to meet Board demands and keep the Waterway boundary intact, but he provides no evidence to support this contention.[13] No reasonable fact-finder could hold, on this record, that such action by the committee was arbitrary, discriminatory, or in bad faith.[14]

To strengthen his argument, Moore argues that the redistricting plan perpetuates pervasive discrimination against the Western districts of the County, a practice engaged in since the building of the Waterway some eighteen years ago. Moore points to the unequal allocation of education resources, allegedly a $600-$1000 disparity in spending per student per year, between the

---

[12] Natural borders can be instructive in drawing districts, due to the potential commonality of interests among sub-populations, such multiple interests created by the geographic diversity within a state or county.

[13] Moreover, the existence of a plan with better population equality, alone, is insufficient to find a redistricting scheme unconstitutional. *See Swann v. Adams*, 385 U.S. 440, 445-46 (1967).

[14] Likewise, Moore also points to the fact that the three districts on the Eastern side of the Waterway have three votes and that the two Western districts only have two votes on the Board. Moore laments that this will never change due to "the 'politics' of Itawamba County." Though there has been contention over whether partisan motivation is sufficient to justify population deviations among districts (*See Cox v. Larios*, 124 S.Ct. at 2809 (SCALIA, J., dissenting)), Moore admits that the population of the Eastern districts exceeds that of the Western districts. Simply, being in the minority is not actionable without evidence of discrimination. That the redistricting committee only met once and that some of the members were absent from the meeting does not establish bad faith, arbitrary, or discriminatory partisan bias.

schools on different sides of the Waterway. The unchallenged evidence of the School Board estimates the allocation of funds to the six County schools for the 2003-2004 fiscal year at no greater than a $361.75 difference in expenditures per student, per year; two schools in the Eastern districts receive less money per student, per year than the schools in the Western districts.

A simple deviation in the average expenditures is neither necessarily the result of discrimination nor inherently discriminatory. Testimony adduced on cross examination reveals that the Dorsey Attendance Center, a school on the Western side of the waterway, has the highest accreditation of any school in the County. Moreover, additional cross examination testimony adduced at trial revealed that the County School District is an open school district, and many of the students from the Western districts attend schools on the East side of the Waterway because there is only one high school located in the two Western districts. Though the latter two arguments do not necessarily controvert the funding disparity, they undercut Moore's contention that any discrimination has disadvantaged the students of the Western districts. In short, Moore is unable to rebut the presumption that the County's redistricting plan is a legitimate exercise of its power.

IV

Even though "a State [must] make an honest and good faith effort to construct districts...as nearly of equal population as is practicable...it is a practical impossibility to arrange

legislative districts so that each one has an identical number of residents, or citizens, or voters."[15]  Of course, mathematical exactitude is made possible by the computer, but that comes with the price of fractured communities of interest and other impractical outcomes that frustrate the remedial goals of the inquiry.

AFFIRMED.

---

[15]  *Reynolds*, 377 U.S. at 577.