**United States Court of Appeals**
**Fifth Circuit**

**F I L E D**

**September 28, 2004**

**Charles R. Fulbruge III**
**Clerk**

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT
_____

No. 03-30866
_____

WILLIE SENSLEY; WILLIAM WASHINGTON; RALPH HOLLEY; DAVID WINE,

Plaintiffs - Appellants,

versus

JABO ALBRITTON, In His Official Capacity as a Member of the
Union Parish Police Jury; JOHNNY BUCKLEY, In His Official
Capacity as a Member of the Union Parish Police Jury; KEITH
BYRAM, In His Official Capacity as a Member of the Union
Parish Police Jury; DEWAYNE HILL, In His Official Capacity
as a Member of the Union Parish Police Jury; JERRY HOLSON,
In His Official Capacity as a Member of the Union Parish
Police Jury; ANNA MILSTEAD, In Her Official Capacity as a
Member of the Union Parish Police Jury; JERRY RUGG, In His
Official Capacity as a Member of the Union Parish Police
Jury; DANNY SMITH, In His Official Capacity as a Member of
the Union Parish Police Jury,

Defendants - Appellees.

_____

Appeals from the United States District Court
for the Western District of Louisiana
_____

Before JOLLY, DAVIS, and JONES, Circuit Judges.

E. GRADY JOLLY, Circuit Judge:

Residents of Union Parish, Louisiana appeal the dismissal of
their vote dilution challenge under § 2 of the Voting Rights Act to
a redistricting plan for electing parish police jury members, a
plan that continued to provide two black-majority districts instead
of expanding to include three. The district court found that the
plaintiffs failed to prove that the African-American population of

the parish was sufficiently geographically compact to support an additional black-majority district and, alternatively, found that the plaintiffs had failed to prove that African-Americans in Union Parish have less opportunity than other members of the electorate to participate in the political process and elect representatives of their choice.  At the close of the case, the plaintiffs filed a motion for the district judge to recuse himself.  The motion was filed under 28 U.S.C. § 455(a), § 455(b)(4), and § 455(b)(5)(iii), alleging that the wife of the federal judge was employed as a state assistant district attorney in the office that was representing the defendants.  The district judge declined to recuse.  Because we find no error in the district judge's findings with respect to the merits of this case and because we find no abuse of discretion in his declining to recuse himself, we AFFIRM the judgment.

I

Union Parish is a political subdivision of Louisiana, which is governed by a nine-member Police Jury.  Each member is elected from one of nine, single-member electoral districts.  According to the 2000 Census, Union Parish has a population of 22,803 persons -- 69.8% of whom are white and 27.9% of whom are black.  Of that total population, there are 16,952 persons of voting age -- 73.2% are white and 24.8% are black.  The 2000 Census showed a 10.2% increase in the total population of Union Parish.[1]  The increase was

---

[1]This increase apparently was not equally observed across racial lines; over that same time period, African-American

2

greater in some geographical areas than others, which resulted in population inequities among the nine districts. A redistricting was thus required to satisfy the one person, one vote constitutional standard. Consequently, the Police Jury and the School Board hired David A. Creed, executive director of the North Delta Regional Planning and Development District, Inc., to assist them in re-apportioning the district.

Creed prepared fourteen different proposed redistricting plans. In twelve of these plans, two of the nine districts were majority black -- the same number as under the old plan. Two of these plans contained three majority-black districts, albeit only marginally.[2] The Union Parish Police Jury ultimately adopted a plan that maintained the existing arrangement of having two majority-black districts. The adopted plan reflected only minor changes to the district boundaries under the old plan. In particular, Police Jury incumbents remained in their same districts and the districts that were majority-black under the old plan remained so under the new one.

Following the parish's adoption of this plan, the plaintiffs ("the Plaintiffs") in this action brought this suit against the members of the Police Jury ("the Defendants"), who were sued in

population increased by only 0.2%.

[2]In each of these two proposed plans, the third minority-majority district only had African-American populations of 53.97% and 51.44%.

3

their official capacity as members of that body.  The Plaintiffs are African-American citizens of Union Parish who are registered to vote.  In addition, one of the Plaintiffs, Willie Sensley, is a current member of the Police Jury, representing District 1.  The Plaintiffs alleged that the redistricting plan adopted by the Parish violates § 2 of the Voting Rights Act of 1965, 42 U.S.C. § 1973, because, by creating only two instead of three majority-black electoral districts, it dilutes the voting rights of African-American citizens of the Parish.

At a trial held on July 30, 2003, both parties presented the testimony of fact and expert witness in support of their positions. The district court took the case under advisement and found in favor of the Defendants on August 14, 2003.  Specifically, the court found that the Plaintiffs had been unable to make the required threshold showing of "geographical compactness" under Thornburg v. Gingles, 478 U.S. 30 (1986).  In the alternative, the district court found that their case still would fail under the totality of the circumstances test outlined in Gingles because the Plaintiffs failed to prove that under the adopted redistricting plan, African-Americans "would have less opportunity than other members of the electorate to participate in the political process and elect representatives of their choice."  42 U.S.C. § 1973(b).

The Plaintiffs assert three points of error.  First, they contend the district court erred in concluding that the African-American voting age population was insufficiently compact.  Second,

4

they argue that the district court erred in concluding that the redistricting plan did not dilute the voting rights of the African-Americans. Finally, they assert that the district judge abused his discretion in failing to recuse himself.

II

A

We first turn to the contention relating to the merits: Section 2 of the Voting Rights Act, as amended, provides that: "No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color...." 42 U.S.C. § 1973(a). To establish a § 2 violation, members of the protected class must demonstrate that, based on the totality of circumstances, they "have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." 42 U.S.C. § 1973(b); see also Gingles, 478 U.S. at 47 ("The essence of a § 2 claim is that a certain electoral law, practice, or structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by black and white voters to elect their preferred representatives.").

In Gingles, the Supreme Court held that a court should analyze a § 2 claim under a two-part framework. First, plaintiffs must satisfy, as a threshold matter, three preconditions. Specifically,

5

"[t]he minority group must demonstrate that: (1) it is sufficiently large and geographically compact to constitute a majority in a single-member district; (2) it is politically cohesive; and (3) the white majority votes sufficiently as a bloc to enable it -- in the absence of special circumstances -- usually to defeat the minority's preferred candidates." Clark v. Calhoun County, Miss., 21 F.3d 92, 94-95 (5th Cir. 1994). Failure to establish all three of these elements defeats a Section 2 claim. Teague v. Attala County, Miss., 92 F.3d 283, 287 (5th Cir. 1996). Second, if the preconditions are proved, plaintiffs must then prove that "based on the totality of the circumstances," they "have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." Clark, 21 F.3d at 94 (quoting 42 U.S.C. 1973(b)).

This court reviews de novo the legal standards the district court applied to determine whether Section 2 has been violated. N.A.A.C.P. v. Fordice, 252 F.3d 361, 364 (5th Cir. 2001). However, because Section 2 vote dilution disputes are determinations "peculiarly dependent upon the facts of each case that require an intensely local appraisal of the design and impact of the contested electoral mechanisms," we review the district court's findings on the Gingles threshold requirements and its ultimate findings on vote dilution for clear error. Id. at 364-65, (quoting Gingles, 478 U.S. 30, 79) (quotations removed). We thereby "preserve[] the

6

benefit of the trial court's particular familiarity with the indigenous political reality without endangering the rule of law." Gingles, 478 U.S. at 79. "[A] finding is clearly erroneous when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been made." Houston v. Lafayette County, Miss., 56 F.3d 606, 610 (5th Cir. 1995) (quoting Anderson v. City of Bessemer City, 470 U.S. 564, 573 (1985))(quotations removed).

B

At trial, the parties stipulated that the second and third Gingles preconditions are met in the present case. Thus, the question before the district court was whether the Plaintiffs were able to establish the first Gingles precondition: that the African-American population in Union Parish is "sufficiently large and geographically compact" to constitute a majority of the voting age population in three single-member districts. Gingles, 478 U.S. at 50.

In support of their position, the Plaintiffs offered at trial two proposed redistricting plans prepared by their expert. Each of these plans featured alternative redistricting configurations wherein a third majority-minority district, District 6, was created. Under these reconfigurations, District 6 would have a total African-American voting age population of 50.5% and 50.1%, respectively. After analyzing these proposed plans, the district court concluded that the Plaintiffs were able to satisfy the size

7

element of the first <u>Gingles</u> precondition, i.e., they had proven that the African-American voting age population of the parish was large enough to constitute a majority of three configured electoral districts. However, the court concluded that they were not able to satisfy the "geographical compactness" element of that same precondition. Accordingly, it dismissed their case.

The Plaintiffs contend this conclusion was clearly erroneous. They argue that the district court's compactness analysis was inappropriately narrow, alleging that it focused primarily on the shape of District 6 when it should have inquired more generally into whether the reconfigured district had "take[n] into account traditional districting principles such as maintaining communities of interest and traditional boundaries." <u>Abrams v. United States</u>, 521 U.S. 74, 92 (1997) (quotations removed). The Plaintiffs note that in <u>Lafayette County</u>, this court criticized a district court's narrow application of the compactness standard. There, we stated:

> The first <u>Gingles</u> precondition does not require some aesthetic ideal of compactness, but simply that the black population be sufficiently compact to constitute a majority in a single-member district. Moreover, the question is not whether the plaintiff residents' proposed district was oddly shaped, but whether the proposal demonstrated that a geographically compact district <u>could be drawn</u>. Thus, although the edges of the plaintiff residents' proposed district look ragged in places, this does not automatically mean failure to meet the first <u>Gingles</u> precondition.

56 F.3d at 611 (citations and quotations removed).

8

The Plaintiffs contend the district court in this case committed a similar error, concluding that District 6 was not geographically compact on the basis of its shape alone.

First, we should note that to the extent the Plaintiffs are suggesting that Lafayette County stands for the proposition that the shape of a district is irrelevant, they are misreading the case. For while Lafayette County may have made it clear that a compactness determination should not hinge on the shape of a district, the shape of a district certainly cannot be disregarded in a compactness inquiry. In Gingles, the Supreme Court held that establishing a Section 2 violation required a plaintiff to prove that a minority population is "geographically compact" enough to constitute an additional district. 478 U.S. at 50. That is, "[Section] 2 does not require the state to create, on predominantly racial lines, a district that is not reasonably compact." Abrams v. Johnson, 521 U.S. 74, 91-21 (1997) (quotations removed); see also Bush v. Vera, 517 U.S. 952, 979 ((1996) ("If, because of the dispersion of the minority population, a reasonably compact majority-minority district cannot be created, § 2 does not require a majority-minority district....") (emphasis added). As the geographical shape of any proposed district necessarily directly relates to the geographical compactness and population dispersal of the minority community in question, it is clear that shape is a significant factor that courts can and must consider in a Gingles compactness inquiry.

The district court in this case gave appropriate weight to the shape of the district here. Contrary to the Plaintiffs' implicit contention, the district court's determination did not rely only on the fact that the proposed additional majority-black districts were not "aesthetically" compact. To be sure, the district court did find the shape relevant, but only insofar as it was indicative of the non-compactness of the minority population in those proposed districts. Moreover, the district court grounded its conclusion on a number of additional factors, including that both proposed additional majority-black districts separated distinct communities and disrupted relationships between incumbents and constituents, which had existed over the years and continued to exist under the Defendants' new plan.

As we have noted, we owe deference to the district court on these factual issues and none of these findings appear clearly erroneous to us. As the district court indicated, the primary obstacle the Plaintiffs face in crafting three "reasonably compact" majority-black electoral districts is the uneven geographical dispersal of the African-American population in Union Parish. Specifically, in Union Parish, the African-American population is largely grouped in three distinct locations: in the west-northwestern portion of the parish, in the Town of Marion (in the northeastern portion of the parish), and in the Town of Farmerville (in the southern center of the parish). Of these three areas, however, only two -- the west-northwest corner of the Parish, and

10

the Town of Farmerville -- have large enough African-American populations to constitute a majority of an electoral district that has some semblance of a center. And, under both the adopted and former districting scheme, these two areas comprise their own Police Jury majority-black electoral districts -- Districts 9 and 1, respectively. The Town of Marion also contains a high concentration of African-Americans of voting age. No one disputes, however, that its numbers are too small by themselves to constitute a majority of an electoral district centered around it.

In line with this reality, both proposed plans crafted a third majority-black district by removing the Town of Marion, in the northeastern section of the parish, from District 2 and also carving a portion of Farmerville, in the southern center of the parish, out of District 1. These two areas of highly-concentrated African-American population, which are roughly 15 miles apart from one another, were then linked together by a narrow corridor of land to form a new District 6. This narrow corridor was carefully drawn to avoid areas of higher Caucasian population concentration so as to ensure that African-Americans remained a majority in the proposed district.[3] The result in each proposed plan was an

_____

[3]The concentration of African-Americans in the west-northwest corner of the Parish is too far from either of the other two areas, is separated by too many precincts of high Caucasian concentration, and in any event, does not contain enough of a surplus of African-Americans of voting age from which to draw additional African-Americans. Accordingly, it remains untouched under each of the Plaintiffs' proposed plans.

11

irregularly-drawn District 6 whose extended and distorted shape --
resulting specifically from excluding non-blacks while
simultaneously adding "excess" blacks from other communities --
constitutes strong evidence that the black minority populations
contained therein are not "reasonably compact."[4]

But, as noted, the shape of the proposed districts is not the
only factor suggesting that the African-American population is
insufficiently compact to support three majority-minority electoral
districts in Union Parish. As the district court pointed out, in
order to connect these two towns together, the Plaintiffs were
required to ignore traditional districting principles such as
maintaining communities of interest and traditional boundaries.
See Abrams, 521 U.S. at 91 ("[T]he § 2 compactness inquiry should
take into account traditional districting principles such as
maintaining communities of interest and traditional boundaries.")
(quotations omitted). For example, the district court noted that
recrafting District 6 required the Plaintiffs to lump together two
groups of African-American citizens who were from two distinct
communities -- the Towns of Marion and Farmerville -- which are
separated by considerable distance (approximately 18 miles) and

---

[4]The population dispersal of one of the resulting districts
resembles an electoral barbell: two areas of heavy African-
American concentration situated at each end and a narrow and
sparsely-populated rural corridor running approximately 18 miles
between these two communities, connecting them together. At some
points, this corridor appears to be less than a half-mile wide.
The other proposed District 6 is less narrow overall, but much more
narrow in parts, with some portions only a city block wide.

12

share few community interests. In addition, each of the proposed plans split the Town of Farmerville in half, ignoring that traditional municipal boundary and disrupting the core of the preexisting electoral district (a black majority district), which had recognized that boundary.[5] Finally, because both of the proposed plans require the serious reshaping of several Police Jury districts located in the central portion of Union Parish, the existing relationship between incumbents and constituents would be significantly disturbed.

For these reasons, the district court's conclusion that the Plaintiffs failed to prove that the African-American population of Union Parish was insufficiently compact was not clearly erroneous. Because the failure to satisfy each of the Gingles preconditions defeats a Section 2 claim, we AFFIRM the district court's dismissal of the Plaintiffs' vote dilution claims.[6] Teague, 92 F.3d at 287.

III

We now turn to the Plaintiffs' contention that the district judge who heard this case, Robert G. James, abused his discretion by failing to recuse himself under 28 U.S.C. § 455(a), § 455(b)(4) and § 455(b)(5)(iii). The Plaintiffs raised this objection

_____

[5]One of the proposed versions of District 6 split the town of Marion in two as well.

[6]Because we have concluded that the district court committed no clear error in finding that the Plaintiffs had failed to meet the Gingles threshold, we do not need to address the court's alternative holding that the Plaintiffs failed to prove vote dilution under a Gingles totality of the circumstances analysis.

13

following the district court's entry of judgment against them, after discovering that Judge James' spouse was an Assistant District Attorney in the office of District Attorney Robert Levy, whose office also represented the Defendants in this case.

A motion to disqualify brought under 28 U.S.C. § 455 is "committed to the sound discretion of the district judge." Chitimacha Tribe v. Harry L. Laws Co., 690 F.2d 1157, 1166 (5th Cir. 1982). And, accordingly, this recusal motion will be reviewed for abuse of discretion. Weinberger v. Equifax, Inc., 557 F.2d 456, 464 (5th Cir. 1977). Courts should take special care in reviewing recusal claims so as to prevent parties from "abus[ing] § 455 for a dilatory and litigious purpose based on little or no substantiated basis." Travelers Ins. Co. v. Liljeberg Enterprises, Inc., 38 F.3d 1404, 1409 n.8 (5th Cir. 1994). Chief Justice Rehnquist has noted, when considering a request for his own recusal, that "a federal judge has a duty to sit where not disqualified which is equally as strong as the duty to not sit where disqualified." Laird v. Tatum, 409 U.S. 824, 837 (1972).

A

As noted, the Plaintiffs identify three statutory bases for their recusal motion:  28 U.S.C. § 455(a), § 455(b)(4), and § 455(b)(5)(iii). Under 28 U.S.C. § 455(a), "Any . . . judge . . . of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned." Courts have interpreted this statute to require recusal if a reasonable

14

person, knowing all of the facts, would harbor doubts concerning the judge's impartiality. Liljeberg v. Health Serv. Acquisition Corp., 486 U.S. 847, 860-61 (1988). In conducting this review, we must ask how these facts would appear to a "well-informed, thoughtful and objective observer, rather than the hypersensitive, cynical, and suspicious person." U.S. v. Jordan, 49 F.3d 152, 156 (5th Cir. 1995). Moreover, courts should be cautious and discriminating in reviewing recusal motions. As the Seventh Circuit has noted:

> A thoughtful observer understands that putting disqualification in the hands of a party, whose real fear may be that the judge will apply rather than disregard the law, could introduce a bias into adjudication. Thus the search is for a risk substantially out of the ordinary.

In re Mason, 916 F.2d 384, 385-86 (7th Cir. 1990), cited with approval in Jordan, 49 F.3d at 156.

In examining this question, we first note that there is no evidence of any direct connection between Judge James and this case. He has no direct financial interest in the outcome nor does he have any relationships with any of the parties that would call his impartiality into question. Mrs. James similarly lacks any direct connection or direct financial interest in this case. There is no social relationship between her and any parties to this matter, including District Attorney Levy. Nor does Mrs. James, in her position as assistant district attorney, have any professional

connection to the case.[7]  Finally, it is undisputed that she has no financial or other interests directly at stake in this case.

Notwithstanding Judge James's lack of any direct interest in this case, either personally or through his wife, the Plaintiffs nevertheless contend that Judge James (through Mrs. James) stands indirectly to benefit from the outcome of this case.  Specifically, they point to Mrs. James's position as an at-will employee in the office of District Attorney Levy, arguing that this status creates an incentive for her to ensure that District Attorney Levy -- her employer -- is successful in this case.[8]  They assert that a threat to Mrs. James's job security would lead a thoughtful observer to question Judge James's impartiality in deciding this case.

---

[7]Her duties within that office are limited solely to criminal prosecution of domestic violence and sex crime cases; she currently does not play and has never played any role in representing the Union Parish Police Jury or advising District Attorney Levy or any other attorneys in his office on matters related to the Police Jury.  This role is assigned to, and exercised exclusively by, Assistant Civil District Attorney S. Andrew Shealy, who was appointed by Levy to serve as lead counsel in this case.  Moreover, in Mrs. James' position as prosecutor of domestic violence and sex crimes -- almost all of which take place in another Parish (Lincoln Parish) -- her only client has been the State of Louisiana; she has never represented Union Parish in any matter.

[8]The Plaintiffs also allege that political animosities exist between Sensley and District Attorney Levy and that knowledge of these animosities would, for a reasonable observer, raise questions about Judge James's impartiality.  Whatever the nature of these alleged political differences, however, they are far too attenuated to implicate Judge James's impartiality.  To the extent that they exist, they exist between Sensley and District Attorney Levy -- not between Sensley and Judge James or even Sensley and Mrs. James. Accordingly, we see no reason why they raise any questions regarding Judge James's impartiality in this case.

16

Thus reduced to its essence, the Plaintiffs are contending that when an immediate family member is an at-will employee in the office representing a party, the impartiality of the judge is called into question. This court, however, has rejected a similar argument in Weinberger, where we recognized that a relative's mere at-will employment relationship with an agency or law firm representing a party before a district court judge in a particular case is insufficient to require a judge to recuse himself. Weinberger, 557 F.2d at 463-64. There, we held that a district judge was not required to recuse himself where the judge's son was an associate in a law firm representing a party to the litigation but had no involvement in the litigation at issue. Id. We concluded that the son's interest as an associate in the law firm was too remote to require disqualification under the "reasonable man" standard of 28 U.S.C. § 455(a). Id. Here, as the district court noted, there is even a lesser need for recusal given the fact that, unlike the law firm context, the family member here has no direct financial interest in the outcome of the case. Accordingly, it appears Judge James did not abuse his discretion in refusing to recuse himself under § 455(a).

B

For similar reasons, it does not appear Judge James abused his discretion in refusing to recuse himself under § 455(b)(4) or § 455(b)(5)(iii). Both of these statutes require recusal when a judge or his spouse has a financial or other interest in the case

17

that could be substantially <u>affected by the outcome of the proceeding</u>. Financial interest is defined as "ownership of a legal or equitable interest, however small, or a relationship as director, adviser, or other active participant in the affairs of a party...." 28 U.S.C. § 455(d)(4). However, "where an interest is not direct, but is remote, contingent or speculative, it is not the kind of interest which reasonably brings into question a judge's partiality." <u>In re Drexel Burnham Lambert, Inc.</u>, 861 F.2d 1307, 1313 (2d Cir. 1988), <u>cert.</u> <u>denied</u>, 490 U.S. 1102 (1989).

Here, the Plaintiffs make arguments similar to their at-will arguments above. They do not contend that the outcome of this case will directly affect any interest -- financial or other -- of Judge James or his spouse. Instead, they argue that the outcome of the case could possibly have an indirect impact on Mrs. James's ongoing status as an employee at the district attorney's office. However, they are only able to make this argument by layering several speculative premises on top of one another to reach a speculative conclusion: if District Attorney Levy loses this case, it <u>might</u> adversely affect his political popularity; and if it adversely affects his political popularity, he <u>might</u> lose his next election; and if he loses his next election, Mrs. James <u>might</u> lose her job if the new district attorney chose not to retain her. This edifice of conjecture will not support an objective conclusion that Judge James has a financial interest in the outcome of this case.

18

Similar conclusions regarding recusal under § 455 have been reached by other courts presented with similar facts. See, e.g., Weinberger, 557 F.2d at 456; In re Kansas Public Employees Retirement System, 85 F.3d 1353, 1364-65 (8th Cir. 1996) (finding no abuse of discretion in denial of recusal where, inter alia, during pendency of litigation judge's daughter accepted defendant's offer of employment as associate attorney); see also Hunt v. American Bank & Trust of Baton Rouge, 783 F.2d 1011 (11th Cir. 1986) (holding that a judge's law clerk's acceptance of an employment offer made by a firm representing a party before that judge did not require recusal as that clerk was not participating in the case in question). Cf. Jordan, 49 F.3d at 156-58 (holding that judge abused her discretion in failing to recuse herself in criminal case because of judge's friendship with attorney whom defendant had accused of criminal actions). See generally Judicial Conference of the United States, Committee on Codes of Conduct, Adv. Op. 60 (April 16, 1979, revised May 27, 1994), at http://www.uscourts.gov/guide/vol2/60.html. For these reasons, we find no abuse of discretion here in the district judge's conclusion that his impartiality could not reasonably be questioned.[9]

CONCLUSION

---

[9]We note that it would have been helpful if the judge had made a statement to the parties concerning his wife's employment (even if he might have reasonably thought that most of the people in this small parish knew of his wife's job) and her noninvolvement in Police Jury matters.

19

In sum, we conclude that the district court did not commit clear error in finding that the Plaintiffs had failed to satisfy <u>Gingles</u>' "geographically compact" precondition. In addition, we hold that the district judge did not abuse his discretion in refusing to recuse himself. Accordingly, the district court's judgment is in all respects

                                                    AFFIRMED.