# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**

February 9, 2015

Lyle W. Cayce
Clerk

No. 13-20491

EDWARD GONZALEZ; ORNALDO YBARRA; PATRICIA GONZALES; THOMAS BERG; REYNALDO GUERRA; SANDRA PUENTE,

Plaintiffs - Appellants Cross-Appellees

v.

HARRIS COUNTY, TEXAS; ED EMMETT,

Defendants - Appellees Cross-Appellants

Appeals from the United States District Court
for the Southern District of Texas
USDC No. 4:11-CV-2907

Before STEWART, Chief Judge, and BARKSDALE and GRAVES, Circuit Judges.

PER CURIAM:[*]

Regarding their proposed Latino-opportunity voting district, Latino citizens of Harris County, Texas, claim the county violated § 2 of the Voting Rights Act of 1965, 52 U.S.C. § 10301 (previously codified at 42 U.S.C. § 1973). Primarily at issue is whether the district court erred in concluding plaintiffs

---

[*] Pursuant to 5th Cir. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5th Cir. R. 47.5.4.

No. 13-20491

failed to propose a hypothetical district in which the Latino voting-age population was sufficiently compact, a precondition to their § 2 claim, based on the proposed district's not sufficiently comporting with traditional districting principles. *Rodriguez v. Harris Cnty., Tex.*, 964 F. Supp. 2d 686, 753 (S.D. Tex. 2013); *see, e.g., Thornburg v. Gingles*, 478 U.S. 30, 50 (1986). Essentially for the reasons stated by the district court regarding that compactness precondition, the judgment is AFFIRMED.

## I.

With over four million residents, Harris County is the third-largest county by population in the United States. The county is governed by a commissioners court, comprised of four commissioners elected from four single-member precincts, and a county judge, elected at-large. Of the over four-million county residents, approximately two million live in the city of Houston. Each of the four precincts includes part of Houston.

Precinct 1 became an African-American-opportunity voting district in 1980 (the boundaries of the precinct were drawn to facilitate election of an African-American-preferred candidate). Precinct 2 has a substantial Latino population; in his testimony in this action, the county's principal expert referred to it as "an influence district for Hispanics".

This action concerns a vote-dilution dispute that arose following the 2010 census. Pursuant to that census, the county's population in 2010 was 40.8 percent Latino, 33.0 percent Caucasian, 18.4 percent African-American, and 7.7 percent Asian-American or "other". In contrast, in 2000, the population was 42.1 percent Caucasian, 32.9 percent Latino, 18.2 percent African-American, and 6.8 percent Asian-American or "other". In short, between 2000 and 2010, the population shift essentially involved Latinos and Caucasians; the Latino population increased, while the Caucasian population declined.

No. 13-20491

In August 2011, in the light of the population change between 2000 and 2010, the county adopted a voter-redistricting plan, reshaping its precincts' boundaries, which will be in effect until after the 2020 census. As part of that process, the commissioners court adopted several districting principles for those precincts: population equality; contiguity and reasonable geographic compactness; use of identifiable geographic boundaries as precinct boundaries; preservation of natural historical boundaries; avoiding splitting neighborhoods and communities of interest; basing the precincts on the existing composition; using whole county voting precincts to draw commissioner precincts; following constitutional and statutory directives; not diluting voting strength of racial or language minority citizens; not fragmenting minority communities or concentrating them in a manner greater than necessary to help them elect minority representation; recognizing incumbent-constituency relationships; keeping existing commissioners in their existing precincts; keeping facilities and service locations established by incumbent commissioners in the precincts of those commissioners; and recognizing commissioners' obligations imposed by law to provide services to the residents of their precincts.

That same month, this action by Latino citizens challenged the adopted plan as violating § 2, contending it diluted Latino votes. Plaintiffs also claimed, *inter alia*: the plan violated § 5 of the Voting Rights Act (preclearance requirement), the Equal Protection Clause, the First and Fourteenth Amendments, and Article I of the Constitution; and the county should be enjoined from enforcing the adopted plan and claimed unlawful voter registration practices. The League of United Latin American Citizens and a group of African-American citizen residents of the county intervened. Regarding the numerous proceedings for this action, such as the district court's plan being used for the 2012 elections, the only issue raised by plaintiffs in this

3

No. 13-20491

appeal is whether the county's adopted plan comports with § 2 of the Voting Rights Act.

In a four-day bench trial in November 2012, the court considered testimony from fact and expert witnesses and, among other exhibits, hypothetical, illustrative redistricting maps plaintiffs presented to demonstrate, *inter alia*, the compactness of the Latino voting-age citizenry. Compactness is the first of three preconditions to analyzing whether, based on a totality of the circumstances, Latinos are entitled to § 2 relief. *E.g., Gingles*, 478 U.S. at 50; *Rodriguez v. Bexar Cnty., Tex.*, 385 F.3d 853, 859 (5th Cir. 2004). Regarding § 2, plaintiffs challenge only the court's conclusion and corresponding findings of fact for the first precondition; they prevailed on the second and third preconditions, 964 F. Supp. 2d at 756, 777, as well as on the "totality of the circumstances" assessment, *id.* at 797, 800.

The court's 1 August 2013, 158-page opinion contains exhaustive findings of fact and conclusions of law, including extremely detailed charts, statistics, and analyses of testimony and other evidence. Based on the 2010 census, the court found, *inter alia*, precincts 1 and 2 were "well below the ideal population mean" under the one-man, one-vote principle, which required redistricting. *Id.* at 712. For the first precondition (numerosity and compactness), the court ruled: plaintiffs presented a geographically compact hypothetical district with a greater-than-50-percent Latino voting-age "minority" population; but, nevertheless, failed to satisfy the compactness precondition because their plans did not respect traditional districting principles. *Id.* at 739, 741, 753-54. (The Voting Rights Act defines a "minority" as "a member of a protected class of racial and language minorities". *Gingles*, 478 U.S. at 43 (interpreting the Voting Rights Act, 52 U.S.C. § 10301).) In that regard, it found plaintiffs' maps failed to respect those principles because, *inter alia*, they adversely impacted the commissioners' ability to deliver services to

4

No. 13-20491

their constituents; shifted approximately 40 percent of the county's population to a new precinct, thereby disrupting incumbent-constituency relationships; split two cities (Baytown and Pasadena) between two precincts; and threatened the existing African-American voting-opportunity precinct in the county.  964 F. Supp. 2d at 753-54.

## II.

Plaintiffs claim:   Latinos comprise a substantial population of the county, but the county's adopted voter-redistricting plan fails to create a precinct in which Latinos may elect a candidate of their choice; therefore, the plan violates § 2 of the Voting Rights Act.  (Because the judgment is affirmed for plaintiffs' failure to satisfy the compactness precondition, we need not consider the county's conditional cross-appeal or its corresponding motion to take judicial notice of certain related election results.)

Section 2 prohibits any "voting qualification or prerequisite to voting or standard, practice, or procedure . . . which results in a denial or abridgement of the  right  of any citizen of the United States  to vote on  account of  race  or color . . . ".  52 U.S.C. § 10301(a).  A § 2 violation "is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by [this statute]". *Id.* § 10301(b).

The Supreme Court's decision in 1986 in *Gingles*, 478 U.S. 30, provides the two-part framework for analyzing § 2 claims.  To succeed, plaintiffs must first satisfy three preconditions:  "(1) [the minority group must be] sufficiently large and geographically compact to constitute a majority in a single-member district; (2) it [must be] politically cohesive; and (3) the white majority [(as noted, the Caucasian population is not a majority in Harris County)] [must] vote[] sufficiently as a bloc to enable it—in the absence of special

5

circumstances—usually to defeat the minority's preferred candidates". *Sensley v. Albritton*, 385 F.3d 591, 595 (5th Cir. 2004) (quoting *Clark v. Calhoun Cnty., Miss.*, 21 F.3d 92, 94-95 (5th Cir. 1994)). "Failure to establish all three of these elements defeats a Section 2 claim." *Id.* (citing *Teague v. Attala Cnty., Miss.*, 92 F.3d 283, 287 (5th Cir. 1996)). "Second, if the [three] preconditions are proved, plaintiffs must then prove that, 'based on the totality of the circumstances,' they 'have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.'" *Id.* (quoting *Clark*, 21 F.3d at 94).

Satisfying the first *Gingles* precondition–compactness–normally requires submitting as evidence hypothetical redistricting schemes in the form of illustrative plans. *E.g., Fairley v. Hattiesburg, Miss.*, 584 F.3d 660, 669 (5th Cir. 2009). In assessing these plans, the issue is not whether plaintiffs' plan is "oddly shaped, but whether the proposal demonstrate[s] that a geographically compact district could be drawn". *Houston v. Lafayette Cnty., Miss.*, 56 F.3d 606, 611 (5th Cir. 1995) (emphasis omitted). The proposed plan must also encompass a district with a greater-than-50-percent voting-age minority population. *Bartlett v. Strickland*, 556 U.S. 1, 19-20 (2009); *Westwego Citizens for Better Gov't v. City of Westwego*, 946 F.2d 1109, 1117 n.7 (5th Cir. 1991) (*Westwego II*). (As noted, a "minority" under the Voting Rights Act is a member of a racial or language minority group, 52 U.S.C. § 10301; *see also* 52 U.S.C. § 10303(f)(2).) Furthermore, under *Gingles*, compactness requires accounting for "traditional districting principles such as maintaining communities of interest and traditional boundaries". *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 433 (2006) (internal quotation marks omitted) (quoting *Abrams v. Johnson*, 521 U.S. 74, 91 (1997)).

As stated, the court found: plaintiffs presented a geographically compact hypothetical district with a greater-than-50-percent voting-age "minority"

population; but, they failed to satisfy the compactness precondition because their plans did not respect traditional districting principles. *Rodriguez*, 964 F. Supp. 2d at 753-54. Therefore, their claim necessarily failed. *E.g., Sensley*, 385 F.3d at 595, 598.

Plaintiffs contend the court committed reversible error on two grounds: traditional districting principles must not be considered in assessing compactness; but, if they must be considered, the court afforded excessive deference to those principles relative to its finding the proposed plans were geographically compact and contained a greater-than-fifty-percent Latino, voting-age population, committing errors of law and making clearly erroneous findings of fact in the process. "This court reviews *de novo* the legal standards the district court applied to determine whether Section 2 has been violated." *Id.* at 595 (citation omitted). Review of the findings of fact related to the *Gingles* preconditions and vote dilution is for clear error. *Id.* (citation omitted). "A finding is clearly erroneous when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been made." *Id.* (alteration, citation, and internal quotation marks omitted).

### A.

Plaintiffs' challenge to the use of traditional districting principles in ruling on compactness fails; those principles must be considered when analyzing that aspect of the first *Gingles* precondition. *Perry*, 548 U.S. at 433 (A § 2 compactness "inquiry should take into account traditional districting principles such as maintaining communities of interest and traditional boundaries" because "[t]he recognition of nonracial communities of interest reflects the principle that a State may not assume from a group of voters' race that they think alike, share the same political interests, and will prefer the same candidates at the polls" (alteration, citations, and internal quotation

No. 13-20491

marks omitted) (quoting *Miller v. Johnson*, 515 U.S. 900, 920 (1995)); *Abrams*, 521 U.S. at 92 ("[T]he § 2 compactness inquiry should take into account traditional districting principles . . . ".); *Fairley*, 584 F.3d at 670 (In assessing compactness, "[c]ourts are expected . . . to take into account traditional districting principles . . . ". (citations and internal quotation marks omitted)).

**B.**

Plaintiffs next assert the court, in concluding they failed to satisfy the compactness precondition, committed an error of law and made clearly erroneous findings of fact by affording excessive deference to traditional districting principles. "[N]o precise rule has emerged governing § 2 compactness" analysis. *Perry*, 548 U.S. at 433 (citation omitted).

Such principles include, *inter alia*: compactness, contiguity, and respect for political subdivisions, *e.g., Shaw v. Reno,* 509 U.S. 630, 647 (1993); avoiding contests between incumbent representatives, *e.g., Karcher v. Daggett,* 462 U.S. 725, 740 (1983); not disrupting preexisting electoral minority-opportunity districts, *e.g., Abrams*, 521 U.S. at 94; *Sensley*, 385 F.3d at 598; and maintaining communities of interest and traditional boundaries, *e.g., Perry*, 548 U.S. at 433. "[T]he party attacking the . . . boundaries [drawn by the political subdivision] must show at the least that [it] could have achieved its legitimate political objectives in alternative ways that are *comparably consistent with* traditional districting principles". *Easley v. Cromartie*, 532 U.S. 234, 258 (2001) (emphasis added).

In *Vieth v. Jubelirer*, the Court eschewed as "unguided and ill suited to the development of judicial standards" both a formulaic approach to assessing traditional districting principles and an individualized method by which to account for them. 541 U.S. 267, 296 (2004) (plurality) ("How much disregard of traditional districting principles [is necessary to find compactness lacking]? . . . What is a lower court to do when . . . the district adheres to some traditional

8

criteria but not others? . . . [T]he devil lurks precisely in such detail". (emphasis omitted)); *id.* at 308 (Kennedy, J., concurring in the judgment) ("The plurality demonstrates the shortcomings of . . . standards that have been considered to date . . . by our dissenting colleagues [which] are either unmanageable or inconsistent with precedent, or both."). Although *Vieth* concerned justiciability of political-gerrymandering matters, *id.* at 306, its assessment of traditional districting principles in the light of *Gingles*' compactness precondition is highly informative.

As noted, *Easley* instructs that plaintiffs have the burden of demonstrating "alternative [illustrative plans] that are comparably consistent with traditional districting principles". 532 U.S. at 258. Therefore, in assessing compactness, courts must account for traditional districting principles; the burden is on plaintiffs to present an illustrative plan adhering to comparably consistent principles–not necessarily principles identical, or subjugated, to a locality's exact prioritization, but simply those within the confines of a "well-developed, legally-adequate plan that can be adjusted" at the remedial stage. *Fairley*, 584 F.3d at 671 n.14.

"Section 2 vote dilution disputes are determinations peculiarly dependent upon the facts of each case that require an intensely local appraisal of the design and impact of the contested electoral mechanism". *Sensley*, 385 F.3d at 595 (citation and internal quotation marks omitted). In that regard, district courts have "particular familiarity with the indigenous political reality", *id.* (citation and quotation marks omitted); and we "owe deference to [them] on [compactness] findings", *id.* at 597. (For this action, the courthouse for the Houston Division of the Southern District of Texas is located in Houston, in Harris County.) Of course, such deference does not alter *de novo* review of legal challenges*, id.* at 595, but it does concern clear-error review of a factual finding to the extent it relies on an "intensely local appraisal of the

design and impact of the contested electoral mechanisms", *id.*, which only a district court is in a position to make. *E.g., Rodriguez*, 964 F. Supp. 2d at 746-53 (exemplifying district court's assessment of intensely local considerations). For example, maintaining traditional boundaries is a recognized traditional districting principle, and a locality may rely, *inter alia*, on this principle in drawing its boundaries. *Perry*, 548 U.S. at 433. But if a shift in population or some other intervening factor renders the importance of maintaining such boundaries marginal, a district court may find this particular principle unpersuasive in the compactness assessment. *See Sensley*, 385 F.3d at 595.

Therefore, when a locality adopts a redistricting plan according to certain traditional districting principles, as the county did in this instance, the district court must consider all such principles relied on by the locality, any opposition to such reliance by § 2 plaintiffs, and any traditional districting principles which § 2 plaintiffs may incorporate into their hypothetical plan in an effort to demonstrate comparable consistency with the plan. *See Easley*, 532 U.S. at 258. The district court may find, furthermore, that the locality's preferred districting principles: are pretext for discrimination; insufficient to trump a finding of geographic compactness; or subordinate to the overall goal of § 2 of preventing "political processes . . . [which] are not equally open to participation by members of a class of citizens protected", 52 U.S.C. § 10301(b); or, conversely, justify the adopted redistricting plan and the minority group's proposed plan fails to comparably account for them.

### 1.

Consistent with this, in its analysis of the compactness precondition, the court addressed plaintiffs' concerns about affording undue deference to the county's preferred districting principles, stating: "[I]t would be unfair to require Plaintiffs to draw maps in strict accordance with the County's priorities. Under [such a] scheme, the entire Section 2 analysis is infected by

which traditional redistricting principles the County has prioritized, thereby precluding any meaningful review . . . ".  964 F. Supp. 2d at 745.

In that regard, the court reasoned that interpreting § 2 to require courts to assess the locality's preferred districting principles "conflates the liability analysis with the remedy analysis".  *Id.*  "Under this scheme", the court held, "the ultimate viability and effectiveness of a remedy is considered at the remedial stage of litigation and not during analysis of the *Gingles* preconditions".  *Id.* (citation omitted).  Furthermore, consistent with *Vieth*, the district court discarded as impractical the rigid, formulaic approach to assessing traditional districting principles.  The court ruled that, instead: "Plaintiffs need only show a 'well-developed, legally-adequate plan that can be adjusted during the remedial stage'".  *Id.* at 746 (alterations omitted) (quoting *Fairley*, 584 F.3d at 671 n.14).  The court's analysis conforms with the requisite approach, as discussed *supra*.

**2.**

For plaintiffs' seven proposed redistricting plans, the court concluded all but two failed to "give rise to a claim of vote dilution".  *Id.* at 733-37.  After reviewing the remaining two proposed plans (*Korbel 257* and *Korbel 325*, named for the creator of the plans, who testified as plaintiffs' principal expert witness) and hearing testimony about them, the court found the plans' "shapes are not so bizarre or irregular as to render them objectionable. . . . The Court thus finds that Plaintiffs' *Korbel 257* and *Korbel 325* are compactly shaped".  *Id.* at 739.

It nevertheless concluded plaintiffs' plans failed to adhere to traditional districting principles, namely, preserving incumbent-constituency relationships and communities of interest/traditional boundaries, and preservation of an effective (the African-American) minority-opportunity precinct.  *Id.* at 753-54.  In reaching that conclusion, the court:  assessed the

*Korbel* plans' impact on incumbent-constituency relationships, comparing how these plans proposed shifting almost 40 percent of the county-wide voting-age population, versus only a nine-percent shift in the county's adopted plan; considered the plans' effect on county assets, noting the substantial number of, *inter alia*, park acreage, square miles, and road miles that would be reallocated; factored in the substantial impact on precinct 1 (the African-American opportunity precinct) and the important facilities that would fall outside of its boundaries under the *Korbel* plans; and found those plans would make coordination of county-service delivery far more difficult.

**a.**

The court found that "a sizeable faction of the [county's] population lives in unincorporated areas—*i.e.,* territory within the bounds of Harris County that is not within the boundaries of a municipality", with approximately 39 percent of residents (1.6 million) residing in the unincorporated part of the county in 2010. *Id.* at 716. In that regard, the court found, as urged by the county, that plaintiffs' proposed plans would result in a significant shift between precincts of the assets used to provide services to the unincorporated areas. *Id.* at 753-54. It found: "[o]n the whole, . . . the movement of the assets as contemplated by Plaintiffs' proposed [plans] would be extremely disruptive", *id.* at 751; and, similarly, those plans "would adversely impact the commissioners' ability to deliver services to their constituents", *id.* at 753.

In urging error, plaintiffs cite *Westwego Citizens for Better Government v. City of Westwego* (*Westwego I*), in which our court relied on an eleventh circuit decision that stated: "Nowhere in the language of Section 2 nor in the legislative history does Congress condition the applicability of Section 2 on the function performed by an elected official". 872 F.2d 1201, 1210 (5th Cir. 1989) (alteration omitted) (quoting *Dillard v. Crenshaw Cnty.*, 831 F.2d 246, 250–51 (11th Cir. 1986)). *Westwego I* held: "Congress did not contemplate that such

No. 13-20491

considerations would play a role in determining whether there has been a violation of section 2". *Id.* at 1211 (emphasis omitted).

The county responds that, in *Sensley*, our court, for compactness *vel non*, considered disruption of incumbent-constituent relationships. *Sensley* provides our court owes deference to the district court's finding of fact that the shape of a district was not "compact" because the proposed plan, *inter alia*, "disrupted relationships between incumbents and constituents". 385 F.3d at 597.

*Sensley* is not in tension with *Westwego I*, which referenced the "function[s] performed by an elected official". *Westwego I*, 872 F.2d at 1210. Here, in its findings about the movement of assets between precincts under plaintiffs' plans, the court did not consider improperly the functions performed by an elected official. Instead, its findings concerned the ability to provide required services.

### b.

Along that line, regarding preservation of communities of interest, the court found the *Korbel* plans split two cities, and that one plan relocated two commissioners in the same precinct and moved two commissioners out of their precincts. Plaintiffs assert the court "observed" a split would occur but failed to "explain whether these splits led to a finding of non-compactness". Plaintiffs maintain the court misapplied governing law because splitting two cities is acceptable "if the overall shape of the demonstrative" precinct "is compact". Traditional boundaries, however, are appropriate factors to consider in compactness analysis. *Perry*, 548 U.S. at 433.

The court considered the splitting of two cities in the context of maintaining both traditional boundaries and continuity in delivery of constituent services. On the other hand, the county's adopted plan splits one city, and several designated census locations and voter tabulation districts.

13

No. 13-20491

Therefore, with respect to the principle that redistricting plans should avoid splitting cities, the plaintiffs' proposed, and the county's adopted, plans are "comparably consistent". *Easley*, 532 U.S. at 258.

**c.**

As the district court found, *Korbel 257* relocated two commissioners within the same district, which violates the traditional districting principle of avoiding contests between incumbents. *Karcher*, 462 U.S. at 740. Further, *Korbel 325* failed to satisfy the compactness precondition because, according to the district court's finding, and as discussed *infra*, it "does not comport well with Precinct 1's status as a performing [minority-]opportunity district". 964 F. Supp. 2d at 748. Last, the court found both of plaintiffs' plans contemplate "shifting almost two-fifths of the county-wide voting age population", in contrast to the approximate nine-percent shift in the county's adopted plan. *Id.* at 749. This weighs heavily in favor of finding plaintiffs failed to accord due deference to traditional districting principles, because, as stated, respect for traditional boundaries is one such principle. *Perry*, 548 U.S. at 433.

**d.**

The court next assessed the preservation of precinct 1 as an effective minority-opportunity district, a recognized traditional districting principle, *e.g., Abrams*, 521 U.S. at 94; *Sensley*, 385 F.3d at 598, which plaintiffs do not claim may not be considered in the compactness analysis. It found fault in plaintiffs' plans for failing to include a "sizeable home-owning African-American population in the Bush Airport area" in precinct 1. 964 F. Supp. 2d at 751. Plaintiffs contend their plans compensated for removing this area from precinct 1 by replacing it with "a sizeable African-American population" in the Alief community. The district court, based in part on plaintiffs' principal expert's testimony (Korbel), found this insufficient because the African-Americans living in Alief reside primarily in apartments.

No. 13-20491

In that regard, relying on the testimony of one of plaintiffs' witnesses, a Latina state senator, who had been elected as the commissioner for precinct 2 in 2002 but was defeated by a Republican candidate in 2010, the court found: apartment-dwellers are more transient; and, therefore, replacing home-dwellers with apartment-dwellers was insufficient to compensate for removal of the home-dwellers from precinct 1. It found plaintiffs' plans would "threaten the continued existence of [that precinct] as an opportunity district". *Id.* at 753. This finding was not clearly erroneous.

Last, contrary to plaintiffs' assertion, the district court's evaluation of the proposed plans was not speculative. It found, *inter alia*, "the African-American community *is retracting* on the edges of the Latino community". *Id.* at 751 (emphasis added). Plaintiffs' expert "*noticed a pattern* . . . [where] the black population decreases and the Latino population in the census tract increases . . . ". *Id.* (emphasis added). Finally, the district court found: "The Alief area, which Mr. Korbel has included in Precinct 1, *is in the middle of* this demographic lifecycle." *Id.* (emphasis added). Accordingly, the district court did not make a clearly erroneous finding of fact.

### e.

In sum, the district court thoroughly considered traditional districting principles and balanced them appropriately against its first finding that the proposed plans included a geographically compact voting-age "minority" district. Therefore, and essentially for the reasons stated in its extremely comprehensive opinion, the court did not commit reversible error in concluding plaintiffs' proposed plans were not "compact" under *Gingles*' first precondition.

### III.

For the foregoing reasons, the judgment is AFFIRMED.

15