# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**

January 17, 2020

Lyle W. Cayce
Clerk

No. 18-11256

ANNE HARDING; GREGORY R. JACOBS; JOHANNES PETER SCHROER; HOLLY KNIGHT MORSE,

     Plaintiffs - Appellants

v.

COUNTY OF DALLAS, TEXAS; CLAY LEWIS JENKINS, in his Official Capacity as County Judge of Dallas County, Texas; THERESA DANIEL; MIKE CANTRELL; JOHN WILEY PRICE; ELBA GARCIA,

     Defendants - Appellees

Appeal from the United States District Court
for the Northern District of Texas

Before HIGGINBOTHAM, DENNIS, and HO, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

Four Anglo voters in Dallas County, Texas challenge the county's 2011 redistricting plan for electing county commissioners, urging that it denied their rights under § 2 of the Voting Rights Act and the Equal Protection Clause of the Fourteenth Amendment by providing only one Anglo-majority district.

## I.

Dallas County is governed by a Commissioners Court, comprising a county judge elected at-large and four commissioners elected from single-member districts. In 2011, the Commissioners Court concluded that

No. 18-11256

redistricting was necessary, as the districts created in response to the 2000 Census were now malapportioned. Between 2000 and 2010, the county's population grew by 6.7%, and its demographics shifted. The Hispanic share of the total population grew from 29.9% in 2000 to 38.3% in 2010 and the African-American share increased from 20.1% to 21.9%, while the Anglo share fell from 44.3% to 33.1%, a drop of nearly 200,000 people over the decade.

Faced with this dynamic, the Commissioners Court turned to redistricting, first hiring redistricting counsel and then an expert in North Texas geography and demographics, Matt Angle. There were then two Republican commissioners, two Democratic commissioners, and a Democratic county judge. The Court met in an executive session to discuss boundaries for map drawing with counsel and Angle. Responding to the resulting instruction, they presented a set of redistricting criteria, which the commissioners unanimously adopted.[1] Using the criteria, Angle generated four maps redistricting the county and presented them to the Commissioners Court during a closed-session meeting. The Commissioners selected one of the maps to be presented in three public hearings. After the hearings, the Commissioners Court adopted the new map by a vote of three to one.[2]

---

[1] The criteria were, in rank order, "(1) complying with the one-person, one-vote requirement . . . , (2) complying with [Sections 2 and 5 of] the Voting Rights Act, . . . (3) respecting population increases and decreases in Dallas County over the decade, (4) respecting boundaries of voting tabulation districts where possible, and if not possible, creating voting Districts that ensure adequate polling place facilities, (5) considering completely redrawn maps, rather than single District maps, (6) respecting municipal and geographic boundaries (but subsidiary to requirements of Constitution and Voting Rights Act), and (7) creating geographically compact Districts composed of contiguous territory (but subsidiary to requirements of Constitution and Voting Rights Act)."

[2] Republican Commissioner Maurine Dickey, who had previously announced that she would not be seeking reelection, did not vote.

No. 18-11256

In its submission of the new map to the Department of Justice for preclearance under § 5 of the Voting Rights Act, the Commissioners Court explained three of the new map's districts[3]:

> The new Commissioner Precinct map maintains two current minority opportunity precincts and creates a new minority opportunity precinct in Precinct 1. Specifically, the new map maintains Precinct 3 as an African American opportunity precinct. The African American population is increased in this precinct from 45.6% to 47.9%. Precinct 4 which is currently represented by a Hispanic, who was the candidate of choice of minority voters in 2010, has not been retrogressed. In fact, the current Precinct 4 is 49.3% Hispanic and 65.5% Black plus Hispanic. The new Precinct 4 is 57.9% Hispanic and 72.1% Black plus Hispanic. Precinct 1 is a new minority opportunity precinct. Precinct 1 has a Hispanic population of 48.0% and is 68.4% Black plus Hispanic.

And District 2 is an Anglo-majority district. Anglo voters account for 60.2% of its total population and 64.0% of the voting-age population. With the new map in effect, the Commissioners Court has a Democratic county judge, one Republican and three Democratic commissioners.

## II.

In January 2015, four Anglo voters, one for each of the four districts, filed this suit against Dallas County and the members of the Commissioners Court in their official capacities. They alleged that the 2011 map violates § 2 of the Voting Rights Act by diluting Anglo votes. They also brought a claim under the Equal Protection Clause of the Fourteenth Amendment, assertedly two separate claims: intentional vote dilution and racial gerrymandering.[4]

---

[3] The Supreme Court had not yet decided *Shelby Cty. v. Holder*, 570 U.S. 529 (2013).

[4] Although Plaintiffs asserted other claims, they are not at issue here.

No. 18-11256

Two years and two amended complaints later, the parties cross-moved for summary judgment. The district court concluded that the "equal protection claim" was pleaded not as a racial gerrymandering claim but "as a vote dilution claim, and nothing more." The district court set the case for trial thirty days hence. Plaintiffs did not seek leave to amend their complaint a third time.

## III.

The case proceeded to a four-day bench trial with testimony from each of the four Plaintiffs and two expert witnesses for each side. The district court concluded that Plaintiffs "failed to prove that, were a second Anglo majority district drawn, Anglos would possess the potential to elect an Anglo Republican." Plaintiffs appeal the rejection of their § 2 vote dilution claim after trial and the district court's pre-trial ruling that no claim of racial gerrymandering was before the court.

## IV.

Vote dilution suits are "peculiarly dependent upon the facts of each case, and require[] an intensely local appraisal of the design and impact of the contested electoral mechanisms."[5] On summary judgment and after trial, questions of law are reviewed *de novo*, while questions of fact are reviewed for clear error.[6] The district court's findings as to the threshold conditions established in *Thornburg v. Gingles* and the district court's ultimate findings on vote dilution are subject to review only for clear error.[7] A finding is clearly erroneous if the "reviewing court is left with the definite and firm conviction

---

[5] *Thornburg v. Gingles*, 478 U.S. 30, 79 (1986) (internal quotation omitted).

[6] *N.A.A.C.P. v. Fordice*, 252 F.3d 361, 364–65 (5th Cir. 2001).

[7] *Sensley v. Albritton*, 385 F.3d 591, 595 (5th Cir. 2004). These three conditions address the existence of racially polarized voting and the relative power of the racial voting blocs. *See Gingles*, 478 U.S. at 50–51.

No. 18-11256

that a mistake has been committed. . . ."[8] By contrast, a finding is not clearly erroneous simply because the reviewing court "is convinced that it would have decided the case differently."[9]

## V.

We turn first to Plaintiffs' standing to assert their § 2 vote dilution claim. The standing gate opens the courthouse door to plaintiffs with an injury-in-fact that is traceable to the defendant's actions and likely to be redressed by a favorable decision.[10] In vote dilution cases, the "harm arises from the particular composition of the voter's own district, which causes his vote—having been packed or cracked—to carry less weight than it would carry in another, hypothetical district."[11]

The district court found that each Plaintiff is an Anglo voter residing in a different district in Dallas County and that each asserts a legally cognizable injury—the dilution of their votes, that the Anglo voting population is packed into District 2, wasting Anglo voting power, and that the remainder of the Anglo population is cracked into Districts 1, 3, and 4, diluting the strength of their Anglo voters.

While the uncontested facts appear to establish standing, Defendants urge that three of the Plaintiffs, through their testimony, nonetheless lost their otherwise-valid standing. As the argument goes, one Plaintiff testified at trial

---

[8] *Anderson v. Bessemer City*, 470 U.S. 564, 573 (1985).

[9] *Id.*

[10] *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992).

[11] *Gil v. Whitford*, 138 S. Ct. 1916, 1931 (2018); *see also id.* at 1935 (Kagan, J., concurring in the judgment) (quoting *Wesberry v. Sanders*, 376 U.S. 1, 7 (1964)) ("To have standing to bring a partisan gerrymandering claim based on vote dilution, then, a plaintiff must prove that the value of her own vote has been 'contract[ed].' And that entails showing, as the Court holds, that she lives in a district that has been either packed or cracked.").

No. 18-11256

that her only injury was that her commissioner—a Republican whom she could not identify—was not conservative enough. Such testimony, Defendants say, admits the want of an injury to a legally cognizable interest and cannot be redressed in this suit, while Plaintiffs dispute the characterization and claimed effect of the testimony.

This argument fails. The Plaintiff's inability to explain the legal theory underlying her vote dilution claim is not fatal. Standing is not a pop quiz administered by able defense attorneys to unsophisticated plaintiffs. It is conceded that each voter resides in a district where their vote has been cracked or packed. That is enough. And the contention that the Plaintiffs' injury cannot be redressed here collapses standing and merit resolution.

## VI.

## A.

The district court concluded that Plaintiffs did not prove that Anglos, a minority in Dallas County, have the potential to elect their preferred candidate, a Republican, in a second commissioner district. Plaintiffs insist that the district court applied the wrong standard, that they need only provide an alternative map with two Anglo-majority districts. In their view, the district court, by demanding more evidence, has required them to show a "sure win," not an opportunity of success.[12]

## 1.

Section 2 of the Voting Rights Act prohibits any "voting qualification or prerequisite to voting or standard, practice, or procedure . . . which results in a denial or abridgement of the right of any citizen of the United States to vote

---

[12] Defendants agree with the decision of the district court and offer additional arguments in its support, which we do not reach.

on account of race or color[.]"[13] It governs efforts to dilute the vote of racial minorities through redistricting. To establish a § 2 vote dilution claim, a plaintiff must show, "based on the totality of circumstances, . . . that the political processes leading to nomination or election" are "not equally open to participation by members of a class of citizens . . . in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice."[14] Section 2 does not, however, "establish[] a right to have members of a protected class elected in numbers equal to their proportion in the population."[15]

In *Gingles*, the Supreme Court articulated a two-step test for establishing a § 2 vote dilution claim.[16] At the first step, the plaintiff must satisfy three threshold conditions: A "minority group" must be "sufficiently large and geographically compact to constitute a majority in a single member district";[17] the minority group must be "politically cohesive";[18] and the majority group must vote as a bloc such that it can "usually . . . defeat the minority's preferred candidate."[19] "Failure to establish any one of these threshold requirements is fatal,"[20] thresholds that guide the determination of whether "minority voters possess the potential to elect representatives in the absence of the challenged structure or practice[.]"[21] If minority voters lack this potential, "they cannot claim to have been injured by that structure or

---

[13] 52 U.S.C. § 10301(a).
[14] *Id.* § 10301(b).
[15] *Id.*
[16] 478 U.S. at 50–51.
[17] *Id.* at 50.
[18] *Id.* at 51.
[19] *Id.*
[20] *Campos v. City of Hous.*, 113 F.3d 544, 547 (5th Cir. 1997).
[21] *Gingles*, 478 U.S. at 51 n.17.

practice."[22] As the Supreme Court explained in *Abbott v. Perez*, "it is hard to see" how the *Gingles* factors "could be met if the alternative to the districting decision at issue would not enhance the ability of minority voters to elect the candidates of their choice."[23]

After meeting the three prongs of *Gingles*, a plaintiff must establish that the "totality of the circumstances" supports a finding of vote dilution.[24] This entails a functional analysis that is "peculiarly dependent upon the facts of each case and requires an intensely local appraisal of the design and impact of the contested electoral mechanisms."[25]

**2.**

The able district court concluded that Plaintiffs satisfied the first prong of *Gingles*—the Anglo minority group was large and compact. It then analyzed the Plaintiffs' evidence in support of the other two prongs of *Gingles*—the cohesion of the Anglo voters and the cohesion of the Hispanic voters. Turning to Plaintiffs' alternative map, as well as the data and expert testimony offered by the parties, the district court concluded that Plaintiffs "have failed to prove the 'ultimate question' of vote dilution under § 2 because they have not proved that the minority group (i.e., Anglos) 'has the potential to elect a [Republican],' which plaintiffs maintain would be the Anglo candidate of choice, in a possible second commissioner district."[26] Accenting the completeness of this failure, the

---

[22] *Id.*

[23] 138 S. Ct. 2305, 2332 (2018).

[24] *Gingles*, 478 U.S. at 79.

[25] *Id.* (internal quotation omitted).

[26] In conducting its analysis, the district court necessarily considered the *Gingles* factors, finding, for example, that Plaintiffs "failed to take into account the geographical dispersion of Anglo Democrats and the high concentration of these types of voters in the neighborhoods plaintiffs would include in their proposed 'Anglo opportunity' districts."

district court observed that this followed even if it assumed Plaintiffs satisfied the three *Gingles* factors:

> [P]laintiffs did not offer *any* evidence at trial that would show how Republican candidates would fare in commissioner elections under their Remedial Plan. In fact, plaintiffs offered no evidence or analysis of *any* election using their proposed Remedial Plan. . . .
>
> . . . Plaintiffs have not presented evidence regarding the "functionality" of their proposed Remedial Plan, and have failed to prove that it is even possible to create two commissioner districts in which Dallas County Anglos would have an opportunity to elect a Republican (which plaintiffs maintain is the Anglo candidate of choice).

Ultimately, the district court found that the Plaintiffs' alternative map would lessen the potential for Anglo voters to elect a second county commissioner, likely resulting in all four districts being represented by Democrats.

**3.**

Plaintiffs first insist that they need only show an increased opportunity—not guaranteed success—for the Anglo-preferred candidate in a hypothetical district. True enough.[27] But an alternative map containing an additional majority-minority district does not necessarily establish an increased opportunity. The Supreme Court's decision in *Abbott v. Perez* illustrates this commonsense conclusion. The Court considered whether the drawing of two districts diluted the voting power of the Latino population.[28] The government's map contained one Latino opportunity district and one

---

[27] *See Gingles,* 478 U.S. at 50 n.17 (emphasis added) ("Unless minority voters possess the *potential* to elect representatives in the absence of the challenged structure or practice, they cannot claim to have been injured by that structure or practice.").

[28] *Abbott,* 138 S. Ct. at 2332.

Anglo district. Seeking a second Latino opportunity district, the plaintiffs in *Abbott* proposed a remedial map with different district lines. In that map, Latinos represented a majority of voting age citizens in both districts. Using election returns from 2010 and 2016, the plaintiffs' expert estimated the performance of the two proposed Latino opportunity districts: "[O]ne performed for Latinos in only 7 out of 35 relevant elections, and the other did so in none of the 35 elections."[29] After reviewing this evidence, the Supreme Court concluded that plaintiffs' alternative map did not improve the ability of Latinos to elect their preferred candidates.[30] As a result, the vote dilution claim failed even though the alternative map there—just like the alternative map here—contained an additional majority-minority district.

Plaintiffs' efforts to diminish *Abbott* fail. They argue that *Abbott*'s force is limited to cases where "the plaintiff's own expert testified that no possible, legal map could perform." In their view, *Abbott* "did not hold that plaintiffs have the burden to prove such performance, only that its stipulated absence was problematic." Not so. The Supreme Court held that "[c]ourts cannot find § 2 violations on the basis of *uncertainty*."[31] The Court expressly rejected the lower court's conclusion that a § 2 claim could prevail because it had not been disproven.[32] Arguably, *Abbott* simply applied this longstanding rule and did not raise the threshold for plaintiffs asserting § 2 claims. More importantly,

---

[29] *Id.*

[30] *Id.*

[31] *Id.* at 2333.

[32] *Id.*

No. 18-11256

our decision need not turn on *Abbott*'s reach. As recognized in *Gingles*, minority voters must have the potential to elect another candidate of their choosing.[33]

Our colleague argues that Plaintiffs have been deprived of fair notice that they must demonstrate an alternative plan under which they could elect an additional Anglo-preferred candidate—in essence, that they lacked notice of a new standard. *Abbott* observed that "[u]nder *Gingles,* the ultimate question is whether a districting decision dilutes the votes of minority voters, . . . and it is hard to see how this standard could be met if the alternatives to the districting decision at issue would not enhance the ability of minority voters to elect the candidates of their choice."[34] The day after *Abbott* was decided, Defendants in this case flagged the opinion for the district court. Plaintiffs responded, urging that *Abbott* worked no relevant change in the law, that the Supreme Court "addressed § 2 only to the extent that the lower court had ruled that a plaintiff ***might*** succeed on its § 2 claim," and that *Abbott* "recognized the uncertainty in that ***might*** and refused to uphold an invalidation of legislatively enacted districts on the basis of something the lower court did not *actually* find." And Plaintiffs did not seek the opportunity to present further evidence. On August 23, 2018, two months after *Abbott,* the district court issued its memorandum opinion and judgment. The Notice of Appeal followed. There was no want of notice and no request for an opportunity

---

[33] *Gingles*, 478 U.S. at 50 n.17 ("Unless minority voters possess the potential to elect representatives in the absence of the challenged structure or practice, they cannot claim to have been injured by that structure or practice."); *see also Cooper v. Harris,* 137 S. Ct. 1455, 1470 (2017) (quoting *Growe v. Emison,* 507 U.S. 25, 40 (1993) (The *Gingles* factors "are needed to establish that 'the minority [group] has the potential to elect a representative of its own choice' in a possible district, but that racially polarized voting prevents it from doing so in the district as actually drawn because it is 'submerg[ed] in a larger white voting population.'").

[34] *Abbott*, 138 S. Ct. at 2332 (citing *LULAC v. Perry,* 548 U.S. 399, 425–26 (2006)).

11

to present further evidence, and no party has brought this argument of no notice to the Court.

Plaintiffs contend that even if Anglo voters are no more likely to elect a second Anglo commissioner under their alternative map, they will have enhanced influence over multiple districts. Plaintiffs acknowledge that § 2 does not require the creation of these "influence districts."[35] However, they contend that "this Court has never said that once the *Gingles* factors are otherwise met, a minority group's ability to influence an election is irrelevant to their opportunity 'to participate in the political process and to elect representative of their choice.'"

Perhaps, but this ability is not enough to establish a vote dilution claim. In *Abbott*, it was dispositive that plaintiffs' alternative map did not provide Latinos with an improved opportunity to elect another Latino-preferred candidate.[36] The Supreme Court dismissed the vote dilution claim without considering whether an influence district could be created.[37] We are pointed to no case in which the ability to create an influence district was considered sufficient to establish a § 2 vote dilution claim.

**4.**

Plaintiffs argue that even if they need to show that a second Anglo-preferred candidate could be elected under an alternative map, the district court incorrectly applied the standard to the evidence. Specifically, they contend that the district court's analysis of their alternative map was flawed for three reasons: (1) its failure to account for non-Anglo cross-over voting, (2)

---

[35] *See Bartlett v. Strickland*, 556 U.S. 1, 18 (2009) (plurality opinion).

[36] *Abbott*, 138 S. Ct. at 2333.

[37] *Id.*

its reliance on estimates produced using exogenous elections, and (3) its failure to properly consider the "totality of the circumstances."

**1.** Plaintiffs assert that the district court accounted for Anglo cross-over voting for Democratic candidates but did not consider non-Anglo cross-over voting for Republican candidates.[38] But the district court relied on estimates of election outcomes that accounted for all Dallas voters, including non-Anglo cross-over voters.

Plaintiffs next insist that the court failed to consider other relevant factors, such as differences in voter turnout or the identity of specific candidates. Of course, turnout, the candidates' identity, and many other factors *could* undermine the accuracy of the predictions. But Plaintiffs offered no evidence that they *did* undermine their accuracy. More to the point, the burden remains upon Plaintiffs to provide evidence that Anglos could elect a second Republican commissioner. Yet as the district court found, "plaintiffs did not offer *any* evidence at trial that would show how Republican candidates would fare in commissioner elections under their Remedial Plan," and the Defendants did.

**2.** Plaintiffs urge that the district court should not have relied on "two cherry-picked examples from exogenous elections in an unusual year . . . ."[39] Angle, one of Defendants' expert witnesses, estimated the performance of Plaintiffs' alternative map by using the election returns from the 2016

---

[38] Cross-over voting occurs when a voter supports the candidate that is not preferred by the majority of the voter's racial group—for example, a Hispanic voter who votes for a Republican candidate.

[39] Exogenous elections are "elections in a district for positions that are not exclusively representative of that district." *Rodriguez v. Harris Cty.,* 964 F. Supp. 2d 686, 759 (S.D. Tex. 2013), *aff'd sub nom. Gonzalez v. Harris Cty.*, 601 F. App'x 255 (5th Cir. 2015).

presidential election and 2016 Dallas County sheriff's election. These exogenous elections, Plaintiffs argue, are not predictive of behavior in future local elections. Although this Court has "unequivocally stat[ed] that evidence from elections for the office at issue is more probative," it has "not bar[red] limited consideration of exogenous elections" as here.[40]

**3.** Pivoting again, Plaintiffs contend that the close defeats of Anglo-preferred candidates prove that their alternative plan gives Anglo voters the chance to elect another Republican commissioner. Under the Plaintiffs' alternative map, the Anglo-preferred candidate would lose 49.4% to 50.6% in District 2 and 49.2% to 50.8% in District 4. Yet as the district court noted, "plaintiffs offered no evidence or analysis of any election using their proposed Remedial Plan," a burden theirs to carry. "Any lack of evidence in the record regarding a violation of the Voting Rights Act of 1965 must be attributed to [plaintiffs], not to the district court."[41] We are not "left with the definite and firm conviction that a mistake has been committed . . . ."[42]

## B.

At the hearing on summary judgment, the district court concluded that there was no racial gerrymandering claim in the case—that it was "pleaded as

---

[40] *Fordice*, 252 F.3d at 374 (internal citation omitted).

[41] *League of United Latin Am. Citizens #4552 (LULAC) v. Roscoe Indep. Sch. Dist.*, 123 F.3d 843, 846 (5th Cir. 1997).

[42] *Anderson v. Bessemer City*, 470 U.S. 564, 573 (1985).

No. 18-11256

[an intentional] vote dilution claim, and nothing more." Plaintiffs challenge that decision.

A racial gerrymandering claim is "analytically distinct" from an intentional vote dilution claim.[43] The Supreme Court explained the difference in *Miller v. Johnson*:

> Whereas [an intentional] vote dilution claim alleges that the [government] has enacted a particular voting scheme as a purposeful device to maintain or cancel out the voting potential of racial or ethnic minorities, an action disadvantaging a particular race, the essence of [a racial gerrymandering claim] . . . is that the [government] has used race as a basis for separating voters into districts.[44]

To prove an intentional vote dilution claim, a plaintiff must show a discriminatory purpose and discriminatory effect.[45] Redistricting plans are unconstitutional if "conceived or operated as purposeful devices to further racial discrimination by minimizing, cancelling out or diluting the voting strength of racial elements in the voting population."[46] Because intentional vote dilution claims are infrequently asserted, "[t]he role that § 2 and *Gingles* play in intentional vote dilution claims as opposed to results-only claims is somewhat unsettled."[47] By contrast, a racial gerrymandering claim establishes "that race was improperly used in the drawing of the boundaries of one or more

---

[43] *Shaw v. Reno*, 509 U.S. 630, 652 (1993).

[44] 515 U.S. 900, 911 (1995) (internal quotations omitted).

[45] *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977).

[46] *Rogers v. Lodge*, 458 U.S. 613, 617 (1982).

[47] *Perez v. Abbott*, 253 F. Supp. 3d 864, 942 (W.D. Tex. 2017). Because a § 2 vote dilution claim can be proven without a showing of intentional discrimination, few voters have asserted intentional vote dilution claims since "the 1982 amendments to the Voting Rights Act made effects a basis for section 2 liability." *Veasey v. Abbott*, 830 F.3d 216, 335 n.15 (5th Cir. 2016) (Costa, J., dissenting in part).

specific electoral districts."[48] In such cases, race must have been "the predominant factor motivating" the redistricting process and "subordinat[ing] traditional race-neutral districting principles, including but not limited to compactness, contiguity, and respect for political subdivisions or communities defined by actual shared interests[.]"[49]

The complaint contained an "Equal Protection" claim arising under the Fourteenth Amendment. In support, the complaint's statement of the claim for relief stated:

> The facts alleged constitute a denial to the Plaintiffs of rights guaranteed by the Equal Protection Clause of Section 1 of the 14th Amendment to the United States Constitution. The Commissioners Court crafted the Discriminating Map and each of its four (4) component CCDs to purposefully fragment Dallas's Anglos, dispersing them among the four (4) CCDs without regard to traditional, neutral redistricting principles. The Commissioners Court designed the Discriminating Map to reduce and lesson Dallas's Anglos' electoral opportunities significantly below the level of opportunities that would have been available under a map compliant with neutral principles. This fragmentation provides undue voting advantages to Dallas's non-Anglo, ethnic-bloc-voting majority. The Discriminating Map was intentionally crafted to allow Dallas's ethnic majority coalition to dominate the Commissioners Court beyond what their voting power and geographic distribution would otherwise suggest and to deny Dallas's Anglos the chance to meaningfully participate in the choice of any commissioner outside of CCD 2.

As Plaintiffs note in their brief, their complaint also stated: "[R]ace was the predominant factor in the Commissioners Court's crafting of the

---

[48] *Ala. Legislative Black Caucus v. Alabama*, 135 S. Ct. 1257, 1265 (2015).

[49] *Miller*, 515 U.S. at 916. "[I]f racial considerations predominated over others, . . . the State [must] prove that its race-based sorting of voters serves a 'compelling interest' and is 'narrowly tailored' to that end." *Cooper*, 137 S. Ct. at 1464. The Supreme Court has assumed that complying with the Voting Rights Act is a compelling interest. *Id.*

Discriminating Map as a whole and in the design of each of the Discriminating Map's component four (4) CCDs." This statement is not found in the claim for relief. Rather, it came five pages earlier and was incorporated by reference into the Equal Protection claim. In Plaintiffs' view, these allegations are enough to state a racial gerrymandering claim.

The district court, however, concluded that Plaintiffs pled an intentional vote dilution claim, not the analytically distinct claim of racial gerrymandering. A racial gerrymandering claim (often called a *Shaw* claim) is distinct and far from subtle in its demands, and Plaintiffs gave no notice that it was being urged. Almost three years before the summary judgment ruling, Defendants in their motion to dismiss had flagged a possible effort to make the complaint: "To the extent Plaintiffs purport to make a racial gerrymandering claim, they also fail to state a claim. . . ." Plaintiffs responded but did not clarify their complaint; rather, they labeled the relevant portion of their response "Analysis of a 14th Amendment, Vote-Dilution Claim." The district court dismissed the motion, concluding that Plaintiffs had pled "plausible claims under the Voting Rights Act and the Equal Protection Clause." One month later, Plaintiffs amended their complaint but did not clarify that they were pursuing a racial gerrymandering claim. Nor did they clarify in subsequent briefing. After summary judgment, Plaintiffs did not seek leave to add a racial gerrymandering claim to their complaint. Given the distinctive character of a *Shaw* claim, that failure alone is sufficient to reject this claim.

All the same, the district court's decision was correct: Plaintiffs did not plead a racial gerrymandering claim. The decision of the three-judge district

court in *Perez v. Abbott* is instructive.[50] The court concluded that two different complaints failed to state racial gerrymandering claims. The first failed primarily because the "Fourteenth Amendment claims [were] couched only in terms of intentional discrimination and vote dilution."[51] The complaint also failed to cite key racial gerrymandering cases, like *Shaw v. Reno*[52] or *Miller v. Johnson*,[53] or to "specifically argue a racial gerrymandering claim."[54] Nor was it enough that "a substantial amount of the evidence relevant to the intentional discrimination claims also supports a finding of unconstitutional racial gerrymandering."[55]

The second complaint was equally deficient.[56] It alleged that "Latino and African American voters in Dallas and Tarrant Counties have been splintered and fragmented in both 2011 and 2013 to diminish their ability to effectively participate in the political process[.]"[57] But the court found that "these allegations appear[ed] to support only their intentional vote dilution claim[.]"[58]

The court did conclude, however, that a third complaint in *Perez* "clearly pleaded" a racial gerrymandering claim.[59] But that claim was not contested, and the complaint alleged seven times that race predominated in different districts. The actual claim for relief consisted of only a substantive sentence and a clause incorporating prior allegations by reference.

---

[50] 253 F. Supp. 3d 864 (W.D. Tex. 2017).

[51] *Perez*, 253 F. Supp. 3d at 932–34.

[52] 509 U.S. 630.

[53] 515 U.S. 900.

[54] *Perez*, 253 F. Supp. 3d at 932.

[55] *Id.*

[56] *Id.* at 933.

[57] *Id.* (internal quotation omitted).

[58] *Id.*

[59] *Id.*

18

No. 18-11256

The complaint before us only once alleged that race predominated, and it made this allegation five pages before stating the claim for relief. Moreover, unlike the brief claim for relief in the third complaint in *Perez*, the Plaintiffs' claim for relief was substantial, spanning fifteen lines of text. It did not mention *Shaw*, *Miller*, or any other racial gerrymandering cases. And though some of the allegations in the claim for relief are consistent with both vote dilution and racial gerrymandering claims, allegations that are merely consistent with a claim provide anemic notice that cannot be seen as sufficient. Plaintiffs, aware of the uncertainty flagged by Defendants, never sought leave to amend at any stage of the case. We therefore hold that Plaintiffs did not plead a *Shaw* claim.

## VII.

We affirm the district court's refusal to entertain a claim of racial gerrymandering and its denial of the vote dilution claim after trial.

No. 18-11256

JAMES C. HO, Circuit Judge, concurring in part and dissenting in part:

In *Abbott v. Perez*, 138 S. Ct. 2305 (2018), the Supreme Court increased the evidentiary burden on plaintiffs in vote dilution cases under Section 2 of the Voting Rights Act. I agree with the majority that, based on the evidence presented at trial, the vote dilution claim in this case fails under *Perez*.

But *Perez* was not decided until after the close of trial in this case. Plaintiffs should have the opportunity on remand to meet the new evidentiary standard announced in *Perez*. For that reason, I respectfully dissent.

\* \* \*

For decades, the Supreme Court has applied a two-prong test to assess vote dilution claims under Section 2 of the Voting Rights Act, 52 U.S.C. § 10301. *See Thornburg v. Gingles* 478 U.S. 30, 50–51 (1986). First, the plaintiff must satisfy three threshold conditions, commonly known as the *Gingles* factors: (1) the racial minority group must be "sufficiently large and geographically compact to constitute a majority in a single member district," (2) that minority group must be "politically cohesive," and (3) the majority must vote as a bloc such that it can "usually . . . defeat the minority's preferred candidate." *Id.* at 50–51. *See also LULAC v. Perry*, 548 U.S. 399, 425–26 (2006) (same). Second, if the plaintiff satisfies all three *Gingles* factors, she must then demonstrate that vote dilution has occurred under the totality of the circumstances test set forth by the Court—in essence, whether a history of racial discrimination exists in the relevant jurisdiction. *Id.* at 426.

Prior to *Perez*, the Court made clear that, once a plaintiff is able to meet the three *Gingles* factors, the vote dilution claim proceeds to the totality of the circumstances test. "If all three *Gingles* requirements are established, the statutory text directs us to consider the 'totality of circumstances.'" *Id.* at 425 (quoting *Johnson v. De Grandy*, 512 U.S. 997, 1011 (1994)). And the totality

20

No. 18-11256

of the circumstances test is not arduous—once the *Gingles* factors are met, courts will have "good reason to believe that § 2 requires drawing a majority-minority district." *Cooper v. Harris*, 137 S. Ct. 1455, 1470 (2017). *See also Clark v. Calhoun County*, 21 F.3d 92, 97 (5th Cir. 1994) ("[I]t will be only the very unusual case in which the plaintiffs can establish the existence of the three *Gingles* factors but still have failed to establish a violation of § 2 under the totality of the circumstances").

The reason for this framework is simple: Once a plaintiff is able to satisfy the three *Gingles* factors, courts are satisfied that the minority group will have the opportunity to elect a representative of its choice. *See, e.g.*, *Harris*, 137 S. Ct. at 1470 ("Those three showings . . . are needed to establish that the 'minority [group] has the potential to elect a representative of its own choice.'") (quoting *Growe v. Emison*, 507 U.S. 25, 40 (1993)).

*Perez* alters this framework. In addition to the three *Gingles* factors, Plaintiffs must survive an additional inquiry before reaching the totality of the circumstances test. Plaintiffs must now affirmatively prove that the minority group will have a "real" opportunity to elect representatives of its choice. *Perez*, 138 S. Ct. at 2333.

So after *Perez*, it is no longer enough for plaintiffs to draw a proposed district that satisfies the three *Gingles* factors. It must additionally prove that the proposed district will in fact perform as plaintiffs hope.

This performance requirement is new. No prior Supreme Court precedent required evidence of performance prior to *Perez*—nor have the parties or the district court cited any. *See also Perez*, 138 S. Ct. at 2358 (Sotomayor, J., dissenting) (criticizing majority for requiring evidence of performance); *cf.* Richard L. Hasen, *Suppression of Minority Voting Rights Is About to Get Way Worse*, SLATE (June 25, 2018), ("[I]n a pretty brief but

21

significant part of the majority opinion, the court in *Abbott* seems to make it harder for plaintiffs to win cases under Section 2."), https://slate.com/news-and-politics/2018/06/the-abbott-v-perez-case-echoes-shelby-county-v-holder-as-a-further-death-blow-for-the-voting-rights-act.html.

In this case, the district court denied Plaintiffs' vote dilution claim based on *Perez*. It held that Plaintiffs satisfied the first *Gingles* factor and presumed that they satisfied the second and third factors as well. It nevertheless rejected Plaintiffs' vote dilution claim—not under the totality of the circumstance test, but because Plaintiffs failed to prove performance. *See Harding v. County of Texas*, 336 F. Supp. 3d 677, 694–95 (N.D. Tex. 2018) ("[A]ssum[ing] that plaintiffs have satisfied each of the three *Gingles* prongs, the court still finds that they have failed to prove the ultimate question of vote dilution under § 2 because they have not proved that the minority group (i.e., Anglos) has the potential to elect a Republican, which plaintiffs maintain would be the Anglo candidate of choice.") (cleaned up).

The district court reached this conclusion, however, despite the fact that *Perez* was not decided until after the close of trial. I would remand to give the parties the opportunity to submit evidence under *Perez*.

\* \* \*

The act of redrawing an electoral district is an inherently politicized matter. So courts naturally proceed with extreme caution before intervening— indeed, three members of the Supreme Court have suggested that courts should not decide vote dilution claims under Section 2 of the Voting Rights Act *at all*. *See Perez*, 138 S. Ct. at 2335 (Thomas, J., joined by Gorsuch, J., concurring); *Holder v. Hall*, 512 U.S. 874, 946 (1994) (Thomas, J., joined by Scalia, J., concurring in the judgment). The majority's reluctance to permit further proceedings on Plaintiffs' vote dilution claim is thus appropriate.

No. 18-11256

But Plaintiffs here have not had the opportunity to prove their case with full notice of the evidentiary standards that will govern their claim. I take no position on how their claim would be resolved on remand. But there is enough here to warrant further review under the new governing standard.[1]

For these reasons, I would remand for further proceedings on Plaintiffs' Section 2 vote dilution claim. I respectfully dissent in part.

---

[1] Consider, for example, the racially charged comments in the record to date—a record that includes comments by one powerful county commissioner that "all of you are white, go to hell," as well as the disparaging description of his fellow county commissioner (the one whose very district is at issue in this case) as "Honey Boo Boo." Consider also that Defendants' evidence of non-performance to date is less than compelling—close margins from only two exogenous races during an anomalous election cycle. *See* Majority Op. 14 (denying claim on the ground that "the Anglo-preferred candidate would lose 49.4% to 50.6% in District 2 and 49.2% to 50.8% in District 4"); *NAACP v. Fordice*, 252 F.3d 361, 374 (5th Cir. 2001) (instructing courts to make only "limited" use of "exogenous election" data). Remand would provide both sides full and fair opportunity to strengthen their evidence in light of *Perez*.